**IN THE UNITED STATES DISTRICT COURT OF MARYLAND
FOR THE NORTHERN DIVISION**

**DAWUD BUYUND MORRIS**                      *
**a/k/a HANSON BUYUND MORRIS**
2802 Garrison Boulevard,                     *
Baltimore, Maryland 21216
                                             *

    Plaintiff                        *

    v.                                   *

**SGT. WAYNE EARL JENKINS**                  *        Case #:  _____
Fmr. Baltimore City Police Officer
*in his individual and official capacity*    *
Fed. Inmate#:  62928-037                     *
501 Gary Hill Road
Edgefield, South Carolina 29824              *
BALTIMORE CITY POLICE DEPARTMENT
                                             *

    Defendant                        *

                                             *

**DET. MOMODU BONDEVA GONDO**
*in his individual and official capacity*    *
Fed. Inmate#:   62925-037
Old North Carolina Hwy 75                    *
Butner, North Carolina  27509
BALTIMORE CITY POLICE DEPARTMENT             *

    Defendant                        *

**OFR. ANTONNIO HOPSON**                     *
*in his individual and official capacity*
601 E. Fayette Street                        *
Baltimore, Maryland 21202
BALTIMORE CITY POLICE DEPARTMENT             *

    Defendant                        *

**MAJOR NATHAN WARFIELD**                    *
*in his individual and official capacity*
601 E. Fayette Street                        *
Baltimore, Maryland 21202

1

BALTIMORE CITY POLICE DEPARTMENT          *

    Defendant                                        *

**FMR. DEP. COMM. FREDERICK BEALEFELD**
*in his individual and official capacity*
601 E. Fayette Street                                *
Baltimore, Maryland 21202
BALTIMORE CITY POLICE DEPARTMENT          *

    Defendant                                        *

**BALTIMORE CITY POLICE DEPARTMENT**      *
601 E. Fayette Street
Baltimore, Maryland 21202                            *

    Defendant                                        *

             **Serve on:**                       *
             Commissioner, Micheal Harrison
             601 E. Fayette Street                      *
             Baltimore, Maryland 21202
                                     *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT AND REQUEST FOR JURY TRIAL

    **NOW COMES**, Plaintiff, Dawud Buyund Morris a/k/a Hanson Buyund Morris, by and

through his attorney, J. Wyndal Gordon of **THE LAW OFFICE OF J. WYNDAL GORDON,**

**P.A.**, to submit this Complaint and Request for Jury Trial pursuant to, inter alia, 28 U.S.C.

§1331, 42 U.S.C. §§1983, 1985, *et al.*, alleging as true the following:

## INTRODUCTION

    In this action, Plaintiff Dawud Buyund Morris seeks compensatory and punitive damages

as well as other relief pursuant to 42 U.S.C. § 1983, 42 U.S.C. §1985, for violations of the

Fourth, and Fourteenth Amendments to the United States Constitution, Articles 24 and 26 of the

2

Maryland Constitution, and Maryland tort law, for the unconstitutional and unlawful conduct of the Defendants. The actions of the Defendants as detailed herein deprived Plaintiff Morris of his civil rights and constitute egregious and malicious, objectively unreasonable violations of numerous rights aforementioned. All of the Defendants captioned in this complaint participated in Plaintiff Morris being falsely arrested, charged, and imprisoned for five years and placed on probation for the illegal possession of a handgun that was planted on him by Baltimore City Police Department (BPD)'s Sgt. Wayne Earl Jenkins, Det. Momodu Bondeva Gondo, and Ofr. Antonnio Hopson.  Defendants Jenkins and Gondo also stole $2,500 in cash from Plaintiff Morris and did not report or identify it as inventory.  The remaining Defendants were aware of BPD's nefarious policies, customs, and practices of violating citizens' civil rights and condoned or otherwise failed to adequately train and supervise against such actions. In this instance of carrying out BPD's said policies, customs, practices, Plaintiff Morris had his civil rights violated when he was falsely arrested, charged and imprisoned by the Officer Defendants during the execution of a search warrant procured for illegal purposes.

## **PARTIES**

1.      Plaintiff, Dawud Buyund Morris ("Plaintiff" or "Morris") is a 40 y.o., African American man who resides in the State of Maryland, City of Baltimore.

2.      Defendant, erstwhile Sgt. Wayne Earl Jenkins, Fed. Inmate#:  62928-037, (hereinafter "Sgt. Jenkins or collectively with other named officers as "Officer Defendants"), is a White male, and was, at all times relevant hereto, employed by Defendant Baltimore City Police Department ("BPD") as an officer acting in the course and scope of his official duties as a Baltimore City Police Officer; Defendant Sgt. Jenkins was on duty and participated in a house

3

raid and the false arrested and imprisonment of Plaintiff; he is being sued in his individual and official capacity under 42 U.S.C. § 1983, 42 U.S.C. §1985, the Fourth, and Fourteenth Amendments to the United States Constitution, Articles 24 and 26 of the Declaration of Rights, and Maryland tort law.

3.       Defendant, erstwhile Det. Momodu Bondeva Gondo, Fed. Inmate#:   62925-037 (hereinafter "Det. Gondo or collectively with other named officers as "Officer Defendants"), is an African American male, and was, at all times relevant hereto, employed by Defendant Baltimore City Police Department as an officer and acting in the course and scope of his official duties as a Baltimore City Police Officer; Defendant Det. Gondo was on duty and participated in a house raid and the false arrested and imprisonment of Plaintiff; he is being sued in his individual and official capacity under 42 U.S.C. § 1983, 42 U.S.C. §1985, the Fourth, and Fourteenth Amendments to the United States Constitution, Articles 24 and 26 of the Declaration of Rights, and Maryland tort law.

4.       Defendant, Ofr. Antonnio Hopson (hereinafter "Ofr. Hopson or collectively with other named officers as "Officer Defendants"), is an African American male, and was, at all times relevant hereto, employed by Defendant Baltimore City Police Department as an officer and acting in the course and scope of his official duties as a Baltimore City Police Officer; Defendant Ofr. Hopson was on duty and participated in a house raid and the false arrest and imprisonment of Plaintiff; he is being sued in his individual and official capacity under 42 U.S.C. § 1983, 42 U.S.C. §1985, the Fourth, and Fourteenth Amendments to the United States Constitution, Articles 24 and 26 of the Declaration of Rights, and Maryland tort law.

5.       Defendant Major Nathan Warfield (hereinafter "Major Warfield" and "Defendant

Warfield") is an adult White male and, at all times relevant hereto, was employed by Defendant BPD as a Major in Defendant BPD's Internal Affairs Division; Defendant Warfield is sued in his individual and professional capacity under 42 U.S. § 1983, § 1985, and the Maryland Declaration of Rights under Articles 24 and 26, as well as Maryland tort law.

6.      Defendant Warfield, through his official capacity as a Major in Defendant BPD's Internal Affairs Division, implemented a policy, practice, or custom of condonation or deliberate indifference to the constitutional violations committed by the Defendant BPD officers aforementioned and had a custom, practice, or policy of failing to investigate and discipline Defendant BPD officers adequately.

7.      Defendant Warfield, in his personal and official capacity, failed to adequately investigate and discipline Defendants Jenkins, Gondo, Hopson, and other police officers of Defendant BPD.

8.      Defendant Warfield's supervisory acts and failures to act are attributable as Defendant BPD's direct and indirect acts and/or failures to act; because Defendant Warfield was a Major in Defendant BPD's Internal Affairs Division on or about August 17, 2011, his acts or failures to act reflected the official custom, policy and practice for Defendant BPD or the failure to correctly implement the same.

9.      Defendant Police Commissioner Frederick Bealefeld (hereinafter "Commissioner Bealefeld" and "Defendant Bealefeld") is an adult White male and, at all times relevant hereto, was employed by Defendant BPD as Police Commissioner or Deputy Commissioner; Defendant Bealefeld is being sued in his individual and official capacity under 42 U.S. § 1983, § 1985, and the Maryland Declaration of Rights under Articles 24 and 26, as well as Maryland tort law.

5

10.     Defendant Bealefeld, through his official capacity as Police Commissioner or Deputy Police Commissioner of Defendant BPD, at all times alleged herein implemented a policy, practice, or custom of condonation or deliberate indifference to the constitutional violations committed by Defendant BPD officers and had a custom, practice, or policy of failing to train Defendant BPD officers adequately.

11.     Defendant Bealefeld actively coached the officers of Defendant BPD's Gun Trace Task Force and other officers as to what to testify to in court when confronted with allegations of illegal activity in order to further shield their actions from discovery.

12.     Defendant Bealefeld, in his personal and official capacity, failed to adequately supervise Defendants Jenkins, Gondo, Hopson, and other police officers of Defendant BPD.

13.     Defendant Bealefeld's supervisory acts and failures to act were directly attributable to Defendant BPD's direct and/or indirect acts and failures to act; because Defendant Bealefeld was the Police Commissioner on or about August 17, 2011, his acts or failures to act reflected official custom, policy, and practice for Defendant BPD or the failure to correctly implement the same.

14.     Defendant Baltimore City Police Department (hereinafter "BPD") is an agency of the State of Maryland; the BPD is responsible for providing police and law enforcement services for the City of Baltimore and for investigating crimes that occur within the City; the BPD has its principal offices at 242 West 29th Street, Baltimore, Maryland 21211-2908 and 601 East Fayette Street, Baltimore, Maryland 21202 .

15.     Upon information and belief, the BPD reposed decision-making authority regarding police officer training and supervision to Commissioner Bealefield and others within

the department; the BPD is a local agency for the purposes of the Local Government Tort Claims Act.

16.     Though it has long been noted by the courts that Defendant BPD is customarily a state agency rather than an agency of a county or municipality, and therefore enjoys the protection of sovereign immunity, this Court has determined that Defendant BPD is a suable entity under 42 U.S.C. § 1983.  *Hector v. Weglein*, 558 F. Supp. 194, 197-99 (D. Md. 1982), *see also Chin v. City of Baltimore*, 241 F. Supp. 2d 546, 547-48 (D. Md. 2003).  The Court ruled Defendant BPD is "so connected with the government of Baltimore City to such an extent as to prevent the Police Department from asserting an Eleventh Amendment immunity."  *Chin* at 548.

17.     Regarding Plaintiff's claims, Defendant BPD is sued pursuant to 42 U.S. § 1983, § 1985, and § 1988, because the named Officer Defendants were acting under color of state law and subjected Plaintiff to deprivation of his civil rights under the United States Constitution and Maryland Declaration of Rights.

18.     Defendant BPD conspired with the Officer Defendants to encourage, tolerate, ratify, and be deliberately indifferent to the following patterns, practices, and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

      a.     The use of unreasonable force, excessive force and unlawful arrest by police officers;

      b.     The improper exercise of police powers, including but not limited to the unreasonable use of force, the excessive use of force, robbery, theft, extortion, unlawful arrests, death while in custody, and violations of citizens' Constitutional rights, particularly in connection with unlawful

7

searches and seizures, as well as racially motivated acts by its police

officers;

c. The monitoring of officers whom it knew or should have known were

suffering from emotional and/or psychological problems that impaired

their ability to function as officers;

d. The failure to identify and take remedial or disciplinary action against

police officers who were subject of prior or internal complaints of

misconduct;

e. Police Officers' use of their status as police officers to employ the use of

excessive force and unlawful arrests, unlawful searches and seizures, or to

achieve ends not reasonably related to their police duties; and

f. The failure of police officers to follow established policies, procedures,

directives and instructions regarding the arrest, detention, pursuit, search

and seizure, duty to aid, rescue, and prevent unnecessary bodily harm, use

of force and arrest powers under such circumstances as presented herein.

19.     Prior to August 17, 2011, Defendant BPD had actual or constructive knowledge

that Defendants Jenkins, Gondo, Hopson, and other police officers of Defendant BPD were

engaged in conduct that posed pervasive and unreasonable risk of constitutional injury to

residents and citizens within the jurisdiction of the City of Baltimore but failed to take

appropriate and adequate remedial action against these police officers to prevent the injuries

suffered by the Plaintiff; Defendant BPD implemented a policy, practice, and custom of

condonation or deliberate indifference to police misconduct, had a custom, practice, or policy of

8

failing to train its officers adequately, and failed to adequately supervise Defendants Jenkins, Gondo, and Hopson.

20.     Defendant BPD's directives and failure to take remedial actions against the pervasive and unreasonable misconducts of these police officers was the proximate cause of Plaintiff's injuries.

21.     At all times the actions and practices of the Defendants named herein and those acting at their direction, were performed under the color of state law and constituted state action within the meaning of the Fourth and/or Fourteenth Amendments to the United States Constitution, and Articles 24 and 26 of the Maryland Declaration of Rights.

22.     On November 18, 2019, the false charges that were filed against Defendant on or about August 17, 2011, were completely Nolle prossed, thereby ending the matter in Plaintiff's favor.

## JURISDICTION AND VENUE

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 22 as if fully set forth herein:

23.     This case presents an actual case and controversy arising under the Fourth and Fourteenth Amendments to the United States Constitution and asserts claims for relief 42 U.S. § 1983, and § 1985, as well as claims for relief under Articles 24 and 26 of the Maryland Constitution and State tort law.

24.     Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and § 1343; this Court also has supplemental jurisdiction over the state law claims against the individual Defendants pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b) inasmuch as Plaintiff's causes of action arose in the District of Maryland, Baltimore City specifically, and at all times relevant to this action all the Defendants were found in this District.

### PRE-SUIT REQUIREMENT

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 25 as if fully set forth herein:

26.     That this matter is being filed in compliance with the LOCAL GOVERNMENT TORT CLAIMS ACT, including section 5-303 and 5-304; a formal certified letter dated May 20, 2020, was served upon the City Solicitor on or about May 22, 2020.

### STATEMENT OF FACTS

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 26 as if fully set forth herein:

27.     On November 18, 2019, after the Baltimore City State's Attorney's Office filed a Motion to Vacate Judgment due to police misconduct, civil rights, fraud, and perjury related convictions against officers Wayne Earl Jenkins and Momodu Bondeva Kenton Gondo of the Gun Trace Task Force.  BPD Officer Antonnio Hopson was also a part of the Gun Trace Task Force and was a participant, aider and abetter in the police misconduct perpetrated against Morris; Hopson additionally failed to render aid to prevent the violations alleged herein.

28.     All of the aforementioned Officers, and a few others, forcibly entered Morris' residence located at 2802 Garrison Boulevard in Baltimore City, Maryland, at 10:55 a.m., to execute a search warrant –which to this day remains questionable in content and subject challenge in this suit.

29.     Defendants Jenkins, Gondo and Hopson were primarily responsible for Morris'
injuries as they instigated the false arrest, malicious prosecution, and false imprisonment of
Morris for the illegal handgun possession.

30.     Defendant Jenkins, with the aid and assistance of Defendants Gondo and Hopson,
falsely claimed that he observed Morris drop a handgun down the heating/cooling vent in the
floor of his second story bedroom where he was sleeping when Jenkins, Gondo and Hopson
entered his dwelling.

31.     The "alleged" handgun was so far down into the heating/cooling vent that
Defendant Jenkins with the aid and assistance of Gondo and Hopson had to break through the
bulk head on the first floor and take an "axe" the interior wall of Morris's recently rented
residence to gain access until he was able to "allegedly" recover the handgun.  Despite Jenkins'
exhaustive efforts, neither Gondo, Hopson, nor any of the other officers present witnessed
Jenkins recover the gun.  However they all joined in creating the story to falsely charge Plaintiff
Morris and took credit for his arrest and subsequent conviction that was later vacated under the
suggestion of innocence and dismissal via nolle pros.

32.     Notwithstanding these facts, Plaintiff Morris was awaken from his sleep, and
arrested from his bed, in his home, and falsely charged with the illegal possession of a handgun
and was subsequently sentenced to a five year term of imprisonment therefor having never
committed the crime.  Morris, to this day, has denied ever having possession of the handgun that
was planted and falsely charged by Defendants Jenkins, Gondo, and Hopson.

33.     Even after being forced under duress to take a plea to the illegally planted
handgun or run the risk a harsher sentence for a far more lengthy period of incarceration if he

were not to prevail at trial, he had and has always maintained his innocence internally. However, Defendants Jenkins' and Gondo's penchant for fluently and effortlessly lying under oath and Morris's previous felony conviction informed his decision to take the plea to a lesser charge after much negotiation via counsel.

34.     Morris served a mandatory five years imprisonment for the handgun charge as a result of Jenkins, Gondo, et al.'s corrupt police practices aforementioned.  The case was entitled *State v. Dawud Buyund Morris a/k/a Hanson Buyund Morris*, 211256021, that, as mentioned above was later brought back to court and dismissed.

35.     Inevitably, on or about March 1, 2017, BPD Officers Jenkins and Gondo were federally charged with engaging in a racketeering conspiracy, racketeering offenses, including planting evidence, illegal drug distribution, extortion, destruction, alteration, or falsification of records, deprivation of rights under color of law, and overtime fraud.  Jenkins was convicted on or about June 7, 2018 and Gondo was convicted on or about February 12, 2019.  Their alleged crimes occurred during the same period of time Morris was falsely arrested, charged, and imprisoned and thus Morris was victimized thereby.

36.     Morris's false arrest, malicious prosecution, and subsequent false imprisonment was in furtherance Jenkins, Gondo, et al.'s aforementioned criminal racketeering enterprise and corrupt police practices.  Hopson aided and abetted their practices by drafting and filing false charges against Morris and having him prosecuted on their behalf.

37.     At all times the actions and practices of the Defendants named herein, and those acting at their direction, were performed under the color of state law and constitute state action within the meaning of the Fourteenth Amendment to the United States Constitution, and

12

Maryland's Declaration of Rights.

## HISTORY OF BPD DECADES LONG CUSTOMS,

## PATTERNS AND PRACTICES OF ABJECT CORRUPTION AND COVER-UPS

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 37 as if fully set forth herein:

38.     The BPD has known or should have known for decades relevant hereto that officers given broad authority as part of various "elite" plainclothes units to combat violence, guns, and drugs, of which Defendants Jenkins, Gondo, and Hopson were members, often engaged in a pattern, custom, or practice of illegal activities such as the ones alleged in this complaint.

39.     Despite actual or constructive knowledge of this pattern or practice, BPD condoned misconduct committed by these units by ignoring widespread abuses.  Rather than discontinuing such plainclothes operations or instituting meaningful reforms and supervision after numerous allegations and scandals, BPD merely rebranded these specialized units periodically.  While the names of these units changed throughout the years, their officers' misconduct remained the same.

40.     The motivation for Defendants and Defendant Officers to either participate in, or allow the misconduct to continue, was for both personal benefit and monetary benefit to the Baltimore City Police Department, and not with any intent to enforce laws or bring perpetrators of crime to justice.

41.     For many years before the complained of conduct, BPD deployed these elite units to investigate and arrest persons suspected of drug distribution and/or of gun violations.  These

13

units included the so called "Flex Squads," Special Enforcement Teams (hereinafter "SETS"),

and the Violent Crime Impact Section (hereinafter "VCIS").

42.     As suggested by the name "plainclothes," members of these units wore ordinary

clothes (such as jeans and t-shirts) and tactical vests while on duty, rather than traditional police

uniforms.

43.     Plainclothes officers have and continue to be referred to as "knockers" or "jump

out boys" throughout Baltimore. They are known for egregious acts of misconduct such as

driving unmarked vehicles towards groups of people, jumping out, assaulting, and conducting

aggressive illegal searches of anyone within the vicinity.

44.     In January 2006, the Baltimore Sun published an article regarding the misconduct

within the BPD Flex Squads.

45.     The Baltimore Sun Article was titled, "Questions Raised for Years about City

Flex Squad" and noted that:

      a.     "The BCPD employed 'flex squads' in all its districts, which, unlike

          normal officers, had enhanced freedom to "chase down suspected

          criminals in neighborhoods dominated by drug dealing and violence."

      b.     "Defense attorneys, prosecutors and community members say they have

          heard for years about allegations of misconduct that included planted

          drugs and troublesome practices about how suspects were treated and

          charged."

      c.     "The Baltimore Sun's 'review of court and other records show[ed] that

          allegations of wrongdoing have dogged some of the squad's members for

years."

d.    "In a warrant police used to search the flex squads office last month,
investigators noted that previous allegations against 'certain officers have
been made as to the planting of controlled dangerous substances on
citizens in an effort to knowingly make false arrests.'"

46.    BPD officers working as part of flex squads repeatedly engaged in a pattern of
misconduct, including numerous instances prior to the complained of incident.

47.    For instance, in 2005, Officers William King and Antonio Murray were charged,
and later received 100 year federal sentences for robbing drug dealers, drug trafficking, and gun
violations after terrorizing Baltimore citizens as plainclothes officers for over a decade.

48.    Additionally, Officer Jemini Jones, a member of the Southwest District's Flex
Squad, was accused of raping women while on duty on two separate occasions, once in October
2005 and the other in December 2005.

49.    While investigating the December 2005 incident involving Officer Jones,
Baltimore drug detectives found "that flex squads' officers had been stealing drugs and cell
phones from people they had arrested, planting evidence, and making false arrests."

50.    Police commanders disbanded the Southwest District's flex squad as a result of
the allegations against Jones and the other flex squad officers involved.  BPD also announced
that it would conduct an internal affairs investigation into "every officer in those units."

51.    BPD was thus on notice, from at least 2005, of the potential for abuse associated
with officers who had the wide latitude to act in a manner similar to that of the flex squad
officers.

52.     In 2010, the BPD disbanded another plainclothes unit in Northwest District after discovering a supervisor and one of the officers had been using a stolen license plate on an unmarked car.

53.     At the same times the allegations first surfaced regarding the flex squads, the Baltimore Sun reported on similar allegations levied against the Special Enforcement Teams, whose "officers [were] accused of lying in charging documents, most of which involve drug arrests that result from car stops."

54.     SET members normally worked in plainclothes, like the flex squads, and patrolled the streets in unmarked cars.  The flex squads were managed by each of the nine district commanders, whereas the SETs were managed directly by the BPD's Chief of Patrol.

55.     A former SET officer has explained in a recent article that he and his fellow unit members were "encouraged to make as many arrests as possible" during their overnight shifts. He also claimed they "stopped about every adult they saw on the street to check their names for open warrants and conducted car stops with the intended goal of searching vehicles."  (apparently without probable cause).

56.     In September 2006, NBC News referred to a release from the Associated Press titled "Baltimore police unit reassigned amid scandal."

57.     The aforementioned article noted that the BPD confirmed its investigation of SET which was described as a "discretionary unit" operating in the Southeastern District.  It reported that "dozens of criminal cases have been thrown out because of misconduct allegations against the specialized unit, allegations that have led the department to reassign all seven of the unit's members to desk jobs."

58.     Despite being aware of the rampant misconduct that plagued the flex squads and SETs, in July 2007, the BPD formed a new elite, plainclothes unit known as the Violent Crimes Impact Sections ("VCIS") to focus on "bad guys with guns." (a new name for the same unconstitutionally condoned conduct).

59.     Like their predecessors, the VCIS members operated with little supervision and unsurprisingly engaged in widespread abuse.  In short order, the VCIS became the source of a disproportionate number of citizen complaints and came under criticism by members of the community and the Baltimore City Council.  Once again, this was un-acted upon.

60.     In September 2014, the Baltimore Sun published an investigative piece titled "Undue Force" which noted:

a.     "Many lawsuits in the City 'stemmed from the now disbarred VCIS, which used plainclothes officers to target high-crime impact.'"

b.     "In 2009, a plainclothes VCIS member beat up a Baltimore citizen, Jerriel Lyles, in an East Baltimore carry-out restaurant.  Mr. Lyles subsequently settled his excessive force case with the City for $200,000.00."

c.     "Officers in the unit were accused by prosecutors of lying on a search warrant and working to protect a drug dealer in order to make arrests."

d.     Three other VCIS members were charged in 2010 with kidnapping two city teens and leaving one in Howard County State Park without shoes, socks, or his cell phone.  The two separate kidnappings occurred in May 2009.

61.     In March 2009, Officer Jemell Rayam, who subsequently worked as a part of the

Gun Trace Task force ("GTTF"), worked as a part of VCIS when he fatally shot Shawn Cannady. It was Officer Rayam's third shooting in a span of 20 months.  The City later settled a lawsuit dealing with the aforementioned incident.

62.     In June 2009, Officer Rayam, while driving an unmarked vehicle with two other plainclothes officers, pulled over a driver for allegedly not wearing a seatbelt.  During the subsequent stop, Officer Rayam and the other officers put the driver in flex cuffs and stole the $11,000.00 they found in the car.

63.     Around the same time, Officer Rayam was awarded the Citation of Valor and the Silver Star for his work in BPD's Violent Crimes Division.

64.     Additionally, Fabien Laronde, a VCIS officer was the subject of numerous complaints regarding planting evidence, using excessive force in 2006, and conducting an illegal strip search of a man in a shopping center parking lot in 2009.

65.     The misconduct in the VCIS was so widespread that in 2013, the FBI initiated an investigation which determined that multiple unit members had falsified reports to further their cases.  Several officers were suspended as a result of the investigation, another received six (6) months of home detention, and yet another pled guilty to federal gun and drug charges and was sentenced to eight (8) years.  In another incident involving a wiretapped call, the officer who pled guilty discussed planting a gun in an unlicensed cab, pulling the cab driver over, and then arresting the cab driver on a gun violation.

66.     Rather than disbanding the VCIS, BPD merely "rebranded" it, calling it the "Special Enforcement Section (hereinafter "SES") in December 2012 while retaining many of the guilty VCIS officers.

18

67.     In addition to the illegal searches and seizures by the various plainclothes units,

BPD maintained a custom, pattern, and practice of conducting illegal stops and seizures,

including but not limited to the conduct that formed the basis of the ACLU's June 2006 lawsuit.

68.     In addition to the fabrication and suppression of evidence by the various

plainclothes units, BPD maintained a custom, pattern, and practice of fabricating and suppressing

evidence as reflected in numerous complaints, civil actions, settlements, and judgments

including, but not limited, to numerous individuals who have been subsequently exonerated for

wrongful convictions, including Walter Lomax, Michael Austin, Wendell Griffin, James Owens,

Sabein Burgess, Antione Pettiford, Tyrone Jones, Malcolm Bryant, Jerome Johnson, and the

instant Plaintiff, Dawud Buyund Morris.

69.     In sum, for many years before the Defendant officers falsely arrested, charged and

imprisoned Plaintiff Morris, BPD knew of the illegal acts regularly committed by its police units.

70.     The illegal conduct of BPD's flex squads, SETs, the VCIS, and other plainclothes

units were no secret to BPD or its policy makers, they were well aware.  Therefore, BPD had

repeated notice of the problems that could and did arise with utilizing units of plainclothes police

officers, with blemished past conduct, driving unmarked vehicles, and who had wide latitude to

illegally combat drug and gun related offenses years before the officer Defendants' misconduct

and corruption alleged by Plaintiff Morris.  Given the knowledge that BPD had prior to the

events at issue in the instant Complaint, a reasonable police department would have taken

sufficient steps to ensure that those events would not recur.  Unfortunately for the victims, BPD

failed to take such steps, thus allowing Defendant Officers to illegally stop, search, seize, plant

and fabricate evidence, and suppress exculpatory evidence with respect to Plaintiff Morris and

many others while acting as members of the flex squads, SETs, VCIS, and other plainclothes units which they had openly done for years.

## BPD INTENTIONALLY AND KNOWINGLY PERMITTED OFFICER DEFENDANTS TO CONTINUE THE FLEX SQUAD'S, SETS' AND VCIS' PATTERN OF ILLEGAL CONDUCT

71.     Much like members of the aforementioned police units, Defendant Officers were members of elite plainclothes units within the BPD with broad authority to roam the city ostensibly looking for guns and drugs.

72.     Although BPD conducted internal investigations into the former elite units and thus had ample opportunity to correct their illegal behavior, it failed to provide the necessary oversight, discipline, or training to ensure that the officer defendants did not engage in the same pattern of misconduct and harm citizens, particularly Plaintiff Morris.

73.     BPD formed the GTTF in May 2007 around the same time it formed the VCIS with the stated goal of tracking and curbing illegal gun sales and activities.

74.     Over the course of the GTTF's existence, BPD and local authorities were aware of GTTF's police misconduct and did nothing to stop or correct it.

75.     In a 2014 case involving Defendant GTTF Officer Wayne Jenkins, an Assistant State's Attorney Molly Webb notified the defense counsel in a criminal prosecution that video camera footage of an alleged incident directly contradicted the sworn statements of probable cause submitted by the GTTF officers.  The case was dismissed, and inconsistencies were reported to BPD's internal affairs division.

76.     Upon information and belief, no investigation was conducted, and no disciplinary

actions were taken against any officers concerning their alleged misconduct.  In fact, Defendant

Wayne Jenkins was subsequently promoted to officer in charge of the GTTF in 2016.

77.     Instances involving the defendant officers and several indictments against GTTF

officers since 2017 demonstrate this failure.

78.     On February 23, 2017, a number of GTTF officers were indicted for various RICO

offenses.

79.     The RICO indictment revealed that GTTF officers engaged in, among other

things, the following overt acts:

     a.     Conducting traffic stops of vehicles and stealing money, property, and

        narcotics from the vehicle occupants; and

     b.     Preparing false and fraudulent official indictment and arrest reports of

        property seized from arrestees, and charging documents concealing the

        fact that the GTTF officers stole money, property, narcotics, and planted

        evidence on individuals.

80.     In the above referenced matter, Defendants Jenkins was found guilty after

pleading guilty to racketeering conspiracy, racketeering, robbery, destruction, alteration, of

falsification of records in a federal investigation, and deprivation of rights under color of law.

Taylor was found guilty of racketeering conspiracy and racketeering.  Defendant Gondo was

found guilty of racketeering and distribution of heroin.

81.     Following the indictments of the GTTF officers, at a press conference, then police

commissioner admitted: "The culture around here contributes to it, and should someone have

known about it?  Absolutely they should have known."

# BPD ENTERED INTO A CONSENT DECREE IN WHICH IT ADMITTED TO A PATTERN AND PRACTICE OF CONDUCT SUBSTANTIALLY SIMILAR TO THAT AT ISSUE HERE AND BASED IN PART ON ACTIVITIES THAT OCCURRED PRIOR THERETO

82.     Following the April 2015 death of Freddie Gray while in police custody, then Baltimore Mayor Stephanie Rawlings-Blake asked the United States Department of Justice Civil Rights Division to conduct a pattern and practice investigation into BPD's policies.

83.     The Justice Department issued an investigative report on August 10, 2016.  That report included the following findings:

      a.    It announced that it "reviewed hundreds of thousands of pages of documents including all relevant policies and training manuals used by the BPD since 2010, BPD's database of internal affairs files; a random sample of about 800 case files on non-friendly force incidents; files on all deadly force incidents since 2010 and other data;

      b.    BPD engaged in a "pattern or practice" of conduct that violated the United States Constitution and federal law, including stops, searches and arrests without the reasonable suspicion or probable cause required under the Fourth Amendment to the United States Constitution;

      c.    That BPD disproportionately stopped African Americans standing, walking, or driving on Baltimore streets.  Even though only 63% of Baltimore City's population is African American, 84% of Baltimore City Police Department's officer's stops were of African Americans.

d.      The forgoing pattern or practice is rooted in BPD's deficient supervision

and oversight of office activity and resulted in part from BPD's Zero

tolerance enforcement strategy, dating back to the early 2000s.

e.      BPD failed to act against officers with a long history of misconduct that is

well known to the department.  For example, one officer currently

employed by the BPD had received approximately 125 complaints from

complainants within the department and from the community since 2010,

and many of these complaints allege serious misconduct.  However, the

DOJ found BPD had sustained only one complaint against the officer for

minor misconduct.

f.      In June 2006, the ACLU of Maryland sued BPD regarding its illegal

arrests of thousands of Baltimore residents.  In 2010, that case settled with

BPD agreeing to change its policies and procedures and submit to an

independent auditor to evaluate its progress towards adoptions of stop and

frisk practices consistent with the United States Constitution.

g.      The final report of the auditor from 2014 noted that there were no systemic

improvements in reporting for those stop and frisk offenses during the

monitoring period; and

h.      Various policies that predate the events at issue in this matter

demonstrated that BPD failed to adequately equip its officers to police

effectively and constitutionally.

84.     The DOJ report specifically highlighted the illegal conduct of the various

plainclothes units (recognizing that as outlines above, "the names and organizations of the plainclothes units have changed multiple times over the years").  It noted that a "disproportionate share of complaints" identified plainclothes officers as "particularly aggressive and unrestrained in their practice of stopping individuals without cause and performing public, humiliating searches."

85.     On January 12, 2017, the United States filed a complaint in the United States District Court for the District of Maryland against BPD.  The complaint alleged that:

a.     In the late 1990's BPD adopted zero tolerance policing strategies that prioritized officers making large number of stops, searches, and arrests for misdemeanor offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of Baltimore City residents; and

b.     Based on data from 2010 - 2015, BPD engaged in a pattern or practice of conduct that violated the United States Constitution and federal laws. Those violations included unconstitutional stops which ran afoul of the rights guaranteed to Baltimore's citizens by the Fourth and Fourteenth Amendments to the Constitution of the United States; and

c.     BPD's violations of the Constitution and federal law are driven by the BPD's systemic deficiencies in policies, training, supervision, and accountability structures.  BPD has been aware of these structural challenges for many years but have not taken the adequate steps to comply with the Constitution or federal law.

24

86.     The same day, the United States and the BPD jointly filed a motion asking the court to approve a 227-page consent decree.  That decree provided in relevant part that:

    a.    BPD will provide its officers with training on stops, searches, and seizures.

    b.    BPD will ensure that a supervising officer reviews all documentation relating to stops, searches, seizures, arrests, for completeness and adherence to the law and BPD policy.

    c.    BPD will audit the aforementioned supervisory report.

87.     On April 7, 2017, the court granted that motion, entered a slightly modified version of the consent decree, and stated that it will retain jurisdiction over the decree until it is terminated.  As of the filing of this complaint the decree remains in place.

## POLICIES, CUSTOMS, AND USAGE OF THE BPD

88.     BPD policy makers, aware since at least the early 2000s of numerous instances of misconduct committed by plainclothes officers and units similar to that at issue here, failed to adequately supervise the plainclothes units, thus allowing the unconstitutional conduct described herein to occur.

89.     BPD supervisors condoned the widespread misconduct within plainclothes units. Despite knowledge that plainclothes units were the source of a disproportionate share of complaints against BPD for many years, and at the center of numerous allegations and cases of misconduct, BPD continued to permit plainclothes officers to roam the streets with high levels of discretion and low levels of supervision.  Even after several public scandals highlighting the abuses endemic to all of the aforementioned plain clothes police squads, BPD did not institute

25

any meaningful oversight of these specialized units.  BPD's continued inaction in the face of the

pervasive constitutional violations evidences its deliberate indifference to the rights of City

residents and Plaintiff Morris in particular.

90.     Despite knowledge that Defendant Officers engaged in repeated acts of

misconduct, BPD did not punish the officers but rewarded them by promoting them and allowing

them to continue policing in these "elite" units.

91.     The frequency and duration of the misconduct involving plainclothes units

demonstrates that the misconduct was pervasive within BPD at all times relevant to the events at

issue.  The widespread reporting of misconduct as described in this Complaint was committed

with the knowledge of BPD supervisors who demonstrated a deliberate indifference to the illegal

conduct.

92.     Upon information and belief, plainclothes officers were encouraged and pressured

by BPD supervisors to recover as many guns and make as many arrests as possible, and

plainclothes officers were promoted in large part based on their arrest statistics, without regard

for the methods these officers used to recover those guns and make those arrests.

93.     Plainclothes officers were praised by BPD supervisors notwithstanding numerous

allegations of misconduct.  For example, Defendant Jenkins was promoted to head the GTTF

despite his history of gross misconduct.  Additionally, in a BPD newsletter, Lieutenant

Christopher O'Ree wrote "I am extremely proud to showcase the work of Sergeant Wayne

Jenkins and [his team] (aka the Gun Trace Task Force)" . . . "their relentless pursuit to make our

streets safer by removing guns and arresting the right people for the right reasons has made our

city safer.  I couldn't be more proud of the strong work of his team . . . this team of dedicated

26

detectives has a work ethic beyond reproach." Again, Sgt. Jenkins was subsequently convicted of police corruption and sentenced to 25 years imprisonment, the longest amount of time of any officer federally indicted.

94.     The unconstitutional conduct at issue in this case including, but not limited to, illegally searching and seizing Plaintiff based upon false, fictitious, and fabricated evidence and then suppressing exculpatory and or impeachment evidence, was sufficiently pervasive within BPD that it assumed the quality of a custom, usage, pattern and practice.

95.     With respect to false arrest, imprisonment, and "evidence planting" claims, BPD supervisors conducted minimal substantive review of plainclothes officers' justifications for their actions.

96.     BPD had actual or constructive knowledge of the conduct and actions as identified above and either intended that the "custom or usage," pattern and practice continue, or was deliberately indifferent to stopping or correcting the conduct which caused the Plaintiff Morris' injuries.

97.     The BPD policymakers, aware of specific instances of police misconduct similar to those at issue here prior to 2005 while in possession of actual knowledge of officers' misconduct, failed to adequately discipline their officers and protect Plaintiff and other City residents by allowing the unconstitutional conduct described herein to continue.

98.     Again, despite rampant misconduct within the plainclothes units, BPD did not supervise or discipline its officers.

99.     At all times relevant hereto, the BPD failed to institute adequate systems and procedures to investigate and punish officers who engaged in the misconduct. For instance, prior

to the events at issue, the BPD's Internal Affairs Division did not investigate or track complaints made against its officers through civil lawsuits --even those that resulted in judgments against the officers that the City was responsible for paying.

100.    This failure, along with many others, allowed officers like Defendant Officers Jenkins, Gondo, and Hopson, to engage in repeated misconduct without consequence.

101.    As detailed in the DOJ Report, BPD's disciplinary system was deficient, among other things, because it:

a.    Discouraged individuals from filing complaints;

b.    Tolerated excessive and chronic delays in resolving disciplinary complaints;

c.    Misclassified serious complaints under the direction of its Supervisors, so they could be considered minor ones and resolved at the command level without IAD (Internal Affairs Division) involvement;

d.    Summarily closed complaints without investigation under Supervisor authority;

e.    Failed to investigate complaints in a timely manner;

f.    Failed to consider evidence that contradicted explanations provided by officers accused of misconduct;

g.    Failed to probe beyond reports that the accused officer already provided;

h.    Provided officers with a detailed notice of the alleged misconduct at the onset of an investigation compromising investigation and creating the possibility that the complaining party could be targeted for retaliation and

intimidation;

i.      Used a trial board system characterized best by delays and deficiencies;

j.      Failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct; and

k.      Failed to identify deficiencies or questionable findings in investigations under the direct authority of BPD supervisors and did not take steps to ensure that investigators had no conflicts of interest with the officers they were investigating.

102.    Additionally, BPD's IAD was under-prepared and overburdened during this time period.  IAD detectives, as detailed in the independent report, lacked key training on how to investigate officers suspected of misconduct.  Upon information and belief, at all times relevant hereto, IAD investigators, were also assigned on average between 35-50 cases to investigate (far above the national average) and were frequently ordered to patrol the streets, further limiting their ability to investigate misconduct. At times, IAD officers were detailed to patrol the streets with the same officers they were investigating.

103.    Retired Police Sergeant Chad Ellis who worked in the IAD during the time of the 2009 investigation of Defendant Jenkins and Gondo, explained the IAD was ill prepared and inexperienced in their area of alleged expertise - from the top to the bottom at that point.

104.    A police spokesperson likewise acknowledged that in 2009 the BPD did not have an adequate intervention system in place at that time for flagging problem officers.

105.    In 2013, after Plaintiff's incident leading to his false arrest and imprisonment, then Police Commissioner Anthony Batts acknowledged in the BPD's Strategic Plan for

29

Improvement that "discipline has not always been a priority for the BPD."  He went on to explain

that for "many years" the "internal affairs system accrued numerous deficiencies" including "a

backlog of disciplinary verdicts that were never carried out and a substantial case backlog."

Commissioner Batts noted that cases could take up to 3 years to resolve.

106.    The police misconduct was sufficiently widespread and pervasive within BPD that

it assumed the quality of a "custom or usage" or pattern and practice of BPD.

107.    BPD had actual or constructive knowledge of the same as identified herein and

either intended that the custom or usage or pattern and practice continue or was deliberately

indifferent to stopping or correcting the same --which caused the Plaintiff Morris' injuries.

108.    BPD was aware of the potential for abuse among elite units like the GTTF since at

least the early 2000s when the Baltimore Sun began reporting on the flex squad and SET

misconduct, and despite having final authority to establish and implement policies, the BPD

permitted and condoned the GTTF and other plainclothes unit's unconstitutional conduct alleged

herein and failed to establish and implement proper training policies.

109.    For example, as described in the DOJ Report, a BPD stop and frisk training lesson

from 2009 incorrectly stated the relevant standard for searches and seizures.  The training

indicated that "Investigative contacts of citizens by members of this agency will be conducted

with articulable reason."  An articulable reason misstates the *Terry* standard requiring reasonable

suspicion based on specific and articulable facts.  The lesson plan later instructed that the

member "must be able to articulate reasonable suspicion or belief a crime has been or will be

committed to perform a stop and frisk."  This similarly misstates the relevant law, as it indicates

that the same standard of suspicion is required for both an investigatory stop and a subsequent

frisk - contrary to the requirement that an officer possess separate reasonable suspicion that an individual is armed and dangerous prior to initiating a frisk.

110.    Additionally, at all times relevant hereto, the BPD lacked adequate staffing to conduct training of officers, facilities for training, and mechanisms to ensure that officers had received and understood the supposedly mandatory training.

111.    In 2015, the former director of BPD's training and academy released a document outlining the numerous deficiencies in training and highlighted the department's "internal culture of placing training second."

112.    The Baltimore Police Department has had repeated notice through, *inter alia*, convictions of their police officers, complaints and suits lodged against their police officers, public reporting, failed polygraph tests, and notifications from State prosecutors that BPD's plainclothes police officers engaged in a widespread pattern of flagrant unconstitutional violations.  Its failure to take any action to stop such conduct constituted the BPD's condoning the pattern and practice.

113.    In sum, BPD's policies, customs, and practices of promoting, facilitating, or condoning improper, illegal and unconstitutional policing, and its policy, custom and practice of failing to adequately supervise, discipline, and train BPD plainclothes units was reflected in the numerous prior allegations and cases of misconduct involving plainclothes police officers. The long history of misconduct committed by plainclothes units was actually or constructively known to BPD supervisors and/or policymakers, who failed to supervise, discipline, or train in response to such notice.  The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of individuals such

as Plaintiff Dawud Buyund Morris.

114.    It is against this backdrop that Plaintiff makes the following claims for relief:

## COUNT I

**Illegal Arrest in the violation of the 4th and 14th Amendments,**

**Pursuant to 42 U.S.C. § 1983, 1985**

*Sgt. Wayne Jenkins, Det. Momodu Gondo, and Ofr. Antonnio Hopson*

*in their  official and personal capacities*

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 114 as if fully set forth herein:

115.    At all times alleged herein, Defendant Sgt. Wayne Jenkins, Momodu Gondo, and Antonnio Hopson, were acting under the color of state law as Officers employed by Defendant BPD and were acting within the scope of their employment.

116.    The Plaintiff, without being violent, was unlawfully arrested, imprisoned and caused to be maliciously prosecuted as a direct and proximate cause of Defendants Jenkins planting an illegal handgun on him by falsely claiming that he possessed it, and Gondo and Hopson who knew the handgun was planted participated in the arrest and charged Morris with, among other things, the offense of illegal possession of a handgun. None of the Defendants had probable cause to believe that the Plaintiff was involved in any gun crimes, and Plaintiff asserts that they did not have had probable cause to be in his home because the warrant was based upon knowingly false information and pretenses submitted to a reviewing magistrate.

117.    The act of detaining Plaintiff and taking him into custody for a gun crime violation without probable cause or legal justification and causing him to be criminally

prosecuted for the same constitutes a false arrest and detention, and a malicious prosecution in violation of his rights under Maryland tort law as well as the State and Federal Constitutions.

118.    Upon information and belief, Defendants Jenkins, Gondo, and Hopson lacked sufficient legal reason to obtain a warrant in the first place and thus obtained the search warrant under false pretenses.  Defendants Jenkins, Gondo, and Hopson further arrested Plaintiff stole $2500 from him that they did not report or inventory.

119.    The acts committed by Officer Defendants were done maliciously, willfully and wantonly, intentionally, and with reasonable certainty that the acts were in violation of Plaintiff's clearly established constitutional rights and would cause harm to Plaintiff.

120.    Defendants Jenkins, Gondo, and Hopson, further conspired with one another to deprive Plaintiff Morris of his civil rights.

121.    Once Jenkins planted the handgun evidence in Plaintiff Morris' residence, then feigned its discovery, his allegations were knowingly false by Gondo and Hopson, but notwithstanding this fact, they took him into custody for the gun and confederated to generate a false police report, and take $2500 cash from Plaintiff for the purpose of depriving him of equal protection of the laws or of equal privileges and immunities under the laws; the respective collaborative acts of Defendants Jenkins, Gondo, and Hopson were done in furtherance of the conspiracy, and Plaintiff Morris suffered as more fully expressed below, personal injuries, property loss, and a deprivation his rights to liberty and freedom as a citizen of the United States.

122.    As a direct and proximate cause of Defendants Jenkins, Gondo, and Hopson's unlawful conduct, Plaintiff Morris was forced to plead guilty to a crime he did not commit under duress from the pain of a harsher sentence if he was unable to prevail against the Officer

Defendants lies at trial; he was sentenced to five years of incarceration without parole, and further suffered and will continue to suffer, severe mental anguish, emotional distress in the form of nightmares, sleep deprivation, loss of appetite, anti-social behavior, deteriorated personal relationships with close family members to the point where they have been irreparably harmed; Plaintiff has lost weight, isolated himself from friends and family, experienced episodes of intense grief, bouts of hysteria; Plaintiff further suffered excessive diarrhea and other physical illnesses (nausea, anxiety); he was so affected that his ability to function or tend to his daily affairs was severely impaired (cleaning, paying bills, personal hygiene, eating regularly); Plaintiff regularly misses important meetings, doctors appointments, and has become so fearful of police that he frequently bursts into tears when recounting the events leading to the filing of the instant complaint.

## COUNT II

**Unlawful Search in the violation of the 4th and 14th Amendments,**

**Pursuant to 42 U.S.C. § 1983, 1985**

***Sgt. Wayne Jenkins, Det. Momodu Gondo, and Ofr. Antonnio Hopson***

***in their  official and personal capacities***

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 122 as if fully set forth herein:

123.     Upon information and belief, Officer Defendants Jenkins, Gondo, and Hopson, searched Plaintiff's residence and person without legal justification, pursuant to a search warrant obtained under false pretenses, and without probable cause to believe Plaintiff was committing or had committed a crime.

124.    The act of searching Plaintiff without probable cause or a warrant amounts to an unlawful search.

125.    There was no factual basis for the allegation that Plaintiff was in possession of narcotics or a handgun.

126.    For the same reasons stated above, Defendants Jenkins, Gondo, and Hopson, further conspired with one another to deprive Plaintiff Morris of his civil rights.

127.    As a direct and proximate cause of Defendants Jenkins, Gondo, and Hopson's unlawful conduct, Plaintiff Morris suffered a guilty plea to a crime he did not commit, five years of incarceration without parole, and further suffered and will continue to suffer, severe mental anguish, emotional distress in the form of nightmares, sleep deprivation, loss of appetite, anti-social behavior, deteriorated personal relationships with close family members to the point where they have been irreparably harmed; Plaintiff has lost weight, isolated himself from friends and family, experienced episodes of intense grief, bouts of hysteria; Plaintiff further suffered excessive diarrhea and other physical illnesses (nausea, anxiety); he was so affected that his ability to function or tend to his daily affairs was severely impaired (cleaning, paying bills, personal hygiene, eating regularly); Plaintiff regularly misses important meetings, doctors appointments, and has become so fearful of police that he frequently bursts into tears when recounting the events leading to the filing of the instant complaint.

## COUNT III

**False Imprisonment in the violation of the 4th and 14th Amendments,**

**Pursuant to 42 U.S.C. § 1983, 1985**

***Sgt. Wayne Jenkins, Det. Momodu Gondo, and***

*Ofr. Antonnio Hopson  in their  official and personal capacities*

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 127 as if fully set forth herein:

128.     At all times relevant to this Complaint, Defendants Jenkins, Gondo, and Hopson detained Plaintiff and denied him of liberty, knowingly without legal justification and with ill will.  There was no proper motivation or legal justification to warrant the search and arrest for a gun crime, nor the his subsequent false imprisonment.

129.     Upon information and belief, Defendants Jenkins, Gondo, and Hopson participated in applying for the search warrant containing false information, and did in fact, subsequently arrest Plaintiff without probable cause of legal justification.

130.     As a result of the Officer Defendants' actions, Plaintiff suffered damage by being held against his will for years without consent or legal justification.

131.     At all times the Defendants Jenkins, Gondo, and Hopson, acted with ill will, without legal justification and improper motivation, to wit, covering up with false charges an illegal search, seizure, and arrest of Plaintiff Morris, an innocent citizen.

132.     As a direct and proximate cause of Defendants Jenkins', Gondo's, and Hopson's unlawful conduct, Plaintiff Morris suffered a guilty plea to a crime he did not commit, five years of incarceration without parole, and further suffered and will continue to suffer, severe mental anguish, emotional distress in the form of nightmares, sleep deprivation, loss of appetite, anti-social behavior, deteriorated personal relationships with close family members to the point where they have been irreparably harmed; Plaintiff has lost weight, isolated himself from friends and family, experienced episodes of intense grief, bouts of hysteria; Plaintiff further suffered

excessive diarrhea and other physical illnesses (nausea, anxiety); he was so affected that his ability to function or tend to his daily affairs was severely impaired (cleaning, paying bills, personal hygiene, eating regularly); Plaintiff regularly misses important meetings, doctors appointments, and has become so fearful of police that he frequently bursts into tears when recounting the events leading to the filing of the instant complaint.

## COUNT IV

**Violation of Articles 24 and 26 of Maryland Declaration of Rights**

*Sgt. Wayne Jenkins, Det. Momodu Gondo, and Ofr. Antonnio Hopson*

*in their official and personal capacities*

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 132 as if fully set forth herein:

133.    Plaintiff submits these claims against the Defendants under Article 24 and 26 of the Maryland Declaration of Rights.

134.    Plaintiff incorporates all allegations, including those in the aforementioned claims of illegal arrest, unlawful search, false arrest and false imprisonment, under this claim, and reiterates that Plaintiff has ostensibly contended violations of Article 24 and 26 throughout this Complaint via their respective federal analogues.

135.    Plaintiff further states that the allegations pled were within the scope of the Officer Defendants employment and were conducted with gross negligence or actual malice as to overcome any limited immunity afforded the Defendant under Articles 24 and 26.

136.    Plaintiff further states that there is otherwise no immunity to be claimed by any Defendant as to relief sought under Article 24 or 26 of the Maryland Declaration of Rights.

137.     This Court may exercise jurisdiction over these claims.

138.     As a direct and proximate cause of Defendants Jenkins', Gondo's, and Hopson's unlawful conduct, Plaintiff Morris suffered a guilty plea to a crime he did not commit, five years of incarceration without parole, and further suffered and will continue to suffer, severe mental anguish, emotional distress in the form of nightmares, sleep deprivation, loss of appetite, anti-social behavior, deteriorated personal relationships with close family members to the point where they have been irreparably harmed; Plaintiff has lost weight, isolated himself from friends and family, experienced episodes of intense grief, bouts of hysteria; Plaintiff further suffered excessive diarrhea and other physical illnesses (nausea, anxiety); he was so affected that his ability to function or tend to his daily affairs was severely impaired (cleaning, paying bills, personal hygiene, eating regularly); Plaintiff regularly misses important meetings, doctors appointments, and has become so fearful of police that he frequently bursts into tears when recounting the events leading to the filing of the instant complaint.

## COUNT V

### FALSE IMPRISONMENT

**Sgt. Wayne Jenkins, Det. Momodu Gondo, and Ofr. Antonnio Hopson**

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 138 as if fully set forth herein:

139.     The actions of Defendant Officers Jenkins, Gondo, and Hopson, caused Plaintiff Morris to be unlawfully deprived of his personal liberty, freedom, and property without his consent and without justification by the malicious, intentional, and wanton acts of Defendants.

140.     The collectively, Defendants' actions demonstrated ill will, improper motivation,

evil purpose, and/or actual malice.

141.    As a result of the unlawful conduct described throughout this Complaint, Morris was detained against his will for five years, and experienced pain, suffering, humiliation, inconvenience, anxiety and embarrassment more fully explained below.

142.    As a result of Defendants' actions, Morris suffered damages including time from his life that he would have otherwise spent freely, without the trauma related to a criminal prosecution, incarceration and probation, emotional trauma, humiliation distress, and was prevented from engaging in his usual employment, duties, activities, and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

143.    As a direct and proximate cause of Defendants Jenkins', Gondo's, and Hopson's unlawful conduct, Plaintiff Morris suffered a guilty plea to a crime he did not commit, five years of incarceration without parole, and further suffered and will continue to suffer, severe mental anguish, emotional distress in the form of nightmares, sleep deprivation, loss of appetite, anti-social behavior, deteriorated personal relationships with close family members to the point where they have been irreparably harmed; Plaintiff has lost weight, isolated himself from friends and family, experienced episodes of intense grief, bouts of hysteria; Plaintiff further suffered excessive diarrhea and other physical illnesses (nausea, anxiety); he was so affected that his ability to function or tend to his daily affairs was severely impaired (cleaning, paying bills, personal hygiene, eating regularly); Plaintiff regularly misses important meetings, doctors appointments, and has become so fearful of police that he frequently bursts into tears when recounting the events leading to the filing of the instant complaint.

**COUNT VI**

**FALSE ARREST**

**Sgt. Wayne Jenkins, Det. Momodu Gondo, and Ofr. Antonnio Hopson**

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 143 as if fully set forth herein:

144.    Defendant officers instituted the criminal proceedings when they charged Plaintiff Morris with a firearm that he never possessed and did not have probable cause or legal justification to do so.

145.    Defendant officers did so maliciously to punish Plaintiff Morris as an innocent citizen rather than to bring him to justice.

146.    Ultimately, on November 18, 2019, Plaintiff Morris was exonerated of all charges after serving five years in prison for a crime he did not commit.

147.    As a result of Defendants Jenkins', Gondo's, and Hopson's actions, Plaintiff Morris suffered damages including, but not limited to, time from his life that he would have otherwise spent freely without the trauma related to a criminal prosecution, incarceration, and probation, emotional trauma, humiliation, distress, and was prevented from engaging in his usual employment, duties, activities, and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

148.    As a direct and proximate cause of Defendants Jenkins', Gondo's, and Hopson's unlawful conduct, Plaintiff Morris suffered a guilty plea to a crime he did not commit, five years of incarceration without parole, and further suffered and will continue to suffer, severe mental anguish, emotional distress in the form of nightmares, sleep deprivation, loss of appetite, anti-social behavior, deteriorated personal relationships with close family members to the point

where they have been irreparably harmed; Plaintiff has lost weight, isolated himself from friends and family, experienced episodes of intense grief, bouts of hysteria; Plaintiff further suffered excessive diarrhea and other physical illnesses (nausea, anxiety); he was so affected that his ability to function or tend to his daily affairs was severely impaired (cleaning, paying bills, personal hygiene, eating regularly); Plaintiff regularly misses important meetings, doctors appointments, and has become so fearful of police that he frequently bursts into tears when recounting the events leading to the filing of the instant complaint.

## COUNT VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Sgt. Wayne Jenkins, Det. Momodu Gondo, and Ofr. Antonnio Hopson

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 148 as if fully set forth herein:

149.    Defendant Officers Jenkins, Gondo, and Hopson, intentionally caused Plaintiff Morris severe emotional distress in his home and his property, by taking an axe and tearing down the interior walls, and physically restricting his movement.

150.    Defendant Officers Jenkins, Gondo, and Hopson, planted a gun, arrested, and falsely charged and had Morris prosecuted, without probable cause or legal justification, for a crime they knew he did not commit.

151.    Defendant Officers Jenkins', Gondo's and Hopson's conduct was intentional malicious, extreme, outrageous, and caused the plaintiff severe emotional distress as described herein.

152.    This conduct was particularly shocking to the plaintiff, who was forced into a

41

criminal prosecution, confinement, and incarceration because the Officer Defendants were being called to perpetuate their lies in a court of law with protection and impunity.

153.    As a result of Defendants' actions, Plaintiff Morris suffered damages including, but not limited to, time from his life that he would have otherwise spent freely without the trauma related to a criminal prosecution, incarceration, and probation, emotional trauma, humiliation, distress, and was prevented from engaging in his usual employment, duties, activities, and pursuits; and will be otherwise injured and damaged, both past, present, and in the future.

154.    As a direct and proximate cause of Defendants Jenkins', Gondo's, and Hopson's unlawful conduct, Plaintiff Morris suffered a guilty plea to a crime he did not commit, five years of incarceration without parole, and further suffered and will continue to suffer, severe mental anguish, emotional distress in the form of nightmares, sleep deprivation, loss of appetite, anti-social behavior, deteriorated personal relationships with close family members to the point where they have been irreparably harmed; Plaintiff has lost weight, isolated himself from friends and family, experienced episodes of intense grief, bouts of hysteria; Plaintiff further suffered excessive diarrhea and other physical illnesses (nausea, anxiety); he was so affected that his ability to function or tend to his daily affairs was severely impaired (cleaning, paying bills, personal hygiene, eating regularly); Plaintiff regularly misses important meetings, doctors appointments, and has become so fearful of police that he frequently bursts into tears when recounting the events leading to the filing of the instant complaint.

## COUNT VIII

## MALICIOUS PROSECUTION

**Sgt. Wayne Jenkins, Det. Momodu Gondo, and Ofr. Antonnio Hopson**

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 154 as if fully set forth herein:

155.    Based upon the allegations contained in paragraphs 1 - 156, Officer Defendants Sgt. Wayne Jenkins, Det. Momodu Gondo, and Ofr. Jenkins is liable to Plaintiff for malicious prosecution because they started and continued a criminal proceeding with malice, and without probable cause or legal justification, for an illegal handgun violation against Plaintiff where the proceeding terminated in Plaintiff's favor on November 18, 2019.

156.    Officers Hopson, Jenkins and Gondo falsely arrested instituted and continued a criminal proceeding against Plaintiff charging him with multiple criminal offenses, and every last one ended in his favor, see below:

| | | |
|---|---|---|
| 1. | Handgun on Person | Nolle Pros |
| 2. | Possession of a Handgun with Felony Conviction | Nolle Pros |

157.    None of the counts were based upon probable cause or legal justification and all of the counts were fabricated by Defendant Officers.

158.    Sgt. Jenkins, Det. Gondo, and Ofr. Hopson pursued gun charges against Plaintiff with malice to cover-up the destruction of his property and to prevent Plaintiff from credibly accessing the court's to aggrieve his losses from the potential unlawful entry and actual unlawful arrest in order to absolve themselves from being held accountable for their misconduct.

159.    Had Plaintiff's forced guilty plea under duress stood, he would not have had all of his rights restored to pursue the violations contained in this civil complaint and his case would have been just another in the annuls of injustices caused by these Officer Defendants.

43

160.     Therefore, Plaintiff was not charged with the bogus offenses by Hopson, Jenkins, and Gondo to bring Plaintiff to justice; their motive was "calculatedly" sinister; it was to silence him about their misconduct and remove him from the community so that he could never credibly report it.

161.     As a direct and proximate cause of Jenkins', Gondo's, and Hopson's unlawful conduct, Plaintiff suffered embarrassment, humiliation, a guilty plea to a crime he did not commit, five years of incarceration without parole, and further suffered and will continue to suffer, severe mental anguish, emotional distress in the form of nightmares, sleep deprivation, loss of appetite, anti-social behavior, deteriorated personal relationships with close family members to the point where they have been irreparably harmed; Plaintiff has lost weight, isolated himself from friends and family, experienced episodes of intense grief, bouts of hysteria; Plaintiff further suffered excessive diarrhea and other physical illnesses (nausea, anxiety); he was so affected that his ability to function or tend to his daily affairs was severely impaired (cleaning, paying bills, personal hygiene, eating regularly); Plaintiff regularly misses important meetings, doctors appointments, and has become so fearful of police that he frequently bursts into tears when recounting the events leading to the filing of the instant complaint.

## COUNT IX

### 42 U.S.C. §1983 - MONELL CLAIM

### (All Defendants)

Plaintiff incorporates by reference the allegations contained in paragraphs 1- 161 as if fully set forth herein:

162.     Defendant BPD is currently run by Commissioner Michael Harrison; but at all

times relevant here, BPD, through its then Commissioner Frederick Bealefield, and Internal

Affairs Major, Nathan Warfield, who were all policy makers, promulgated an official policy of

turning a blind-eye, ratifying, condoning and at times praising and rewarding police corruption

and misconduct as alleged in great detail throughout this complaint creating a culture or

corruption in the department.

163.    This culture of corruption included violating the constitutional rights of

Baltimore City residents, which included Plaintiff's false arrest, imprisonment, and malicious

prosecution perpetrated by Sgt. Jenkins, Det. Gondo, and Ofr. Hopson, who were all known to

BPD, Comm. Frederick Bealefield, and Nathan Warfield, to be involved in police misconduct

and to violate the constitutional rights of City residents on a regular basis and they did nothing to

stop it.

164.    Said violations of Plaintiff's and others constitutional rights was the moving force

of the aforementioned policy, practice, or custom because, to them, the need to get arrests, good

or bad, was far more important than constitutional policing.  In fact, upon information and belief,

it was incentivized by the policy makers such as Bealefield and Warfield either expressly or via

policies, practices and customs of BPD.

165.    The training or hiring procedures of BPD's policymakers were inadequate; BPD's

policymaker were deliberately indifferent in adopting the hiring or training policy that

constitutionally protected the rights of citizens, including Plaintiff; and the inadequate hiring or

training policy directly caused the Plaintiff's injuries because of the complete lack of supervision,

oversight, discipline, etc.

**WHEREFORE**, Plaintiff, Dawud Buyund Morris, demands judgment against each

45

Defendant, including the Baltimore City Police Department, jointly, and/or severally, for

compensatory damages in the amount that exceeds $75,000, as well as punitive damages,

interest, costs, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b) and other

applicable federal enabling statutes; Plaintiff Morris further requests such other and further releif

deemed fair and just.

      Respectfully submitted,

      _____/s/_____

J. Wyndal Gordon

Fed. Bar No.:  23572

MD. St. Bar No.:  9506210156

**THE LAW OFFICE OF J. WYNDAL GORDON, P.A.**

20 South Charles Street, Suite 400

Baltimore, Maryland 21202

410.332.4121

Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT OF MARYLAND**
**FOR THE NORTHERN DIVISION**

**DAWUD BUYUND Morris**                         \*
**a/k/a HANSON BUYUND Morris**
2802 Garrison Boulevard,                        \*
Baltimore, Maryland 21216
                                                \*
     Plaintiff
                                                \*
     v.
                                                \*
**SGT. WAYNE EARL JENKINS**
Fmr. Baltimore City Police Officer              \*       Case #:      _____
*in his individual and official capacity*
Fed. Inmate#:  62928-037                         \*
501 Gary Hill Road
Edgefield, South Carolina 29824                 \*
BALTIMORE CITY POLICE DEPARTMENT
                                                \*
     Defendant
                                                \*
**DET. MOMODU BONDEVA GONDO**
*in his individual and official capacity*       \*
Fed. Inmate#:   62925-037
Old North Carolina Hwy 75                        \*
Butner, North Carolina  27509
BALTIMORE CITY POLICE DEPARTMENT                \*

     Defendant                   \*

**OFR. ANTONNIO HOPSON**                         \*
*in his individual and official capacity*
601 E. Fayette Street                           \*
Baltimore, Maryland 21202
BALTIMORE CITY POLICE DEPARTMENT                \*

     Defendant                   \*

**MAJOR NATHAN WARFIELD**                        \*
*in his individual and official capacity*
601 E. Fayette Street                           \*
Baltimore, Maryland 21202

47

BALTIMORE CITY POLICE DEPARTMENT          *

    Defendant                                           *

**FMR. DEP. COMM. FREDERICK BEALEFELD**
*in his individual and official capacity*
601 E. Fayette Street                                   *
Baltimore, Maryland 21202
BALTIMORE CITY POLICE DEPARTMENT          *

    Defendant                                           *

**BALTIMORE CITY POLICE DEPARTMENT** *
601 E. Fayette Street
Baltimore, Maryland 21202                        *

    Defendant                                           *

                **Serve on:**                      *
                Commissioner, Micheal Harrison
                601 E. Fayette Street           *
                Baltimore, Maryland 21202
                              *

**************************************************************************

## <u>REQUEST FOR JURY TRIAL</u>

**NOW COMES**, Plaintiff to demand is Jury Trial in this matter.

Respectfully submitted,

_____/s/_____
J. Wyndal Gordon
Fed. Bar No.:  23572
MD. St. Bar No.:  9506210156
**THE LAW OFFICE OF J. WYNDAL GORDON, P.A.**
20 South Charles Street, Suite 400
Baltimore, Maryland 21202
410.332.4121
Attorney for Plaintiff

48